R. C. CONVERSE, Appellant, v. J. B. ELLIOTT et al., Appellees.

**VENDOR AND PURCHASER:** Modification or Rescission of Contract
—Forfeiture (?) or Rescission (?) A contract which provides for
the *forfeiture* of the entire amount paid by a purchaser on a land

deal will be enforced—even though forfeitures are in disfavor in the law—when the contract and the attending facts and circumstances show that a forfeiture was intended, and not a *rescission* of the original contract of purchase.

**Headnote 1:**  39 Cyc. p. 1382.

*Appeal from Marion District Court.*—W. S. COOPER, Judge.

NOVEMBER 24, 1925.

ACTION in equity, to recover money paid by the plaintiff to the defendants on a contract for the purchase of a farm, together with the value of improvements made therein, and to cancel a certain mortgage executed by plaintiff to the defendants, and also to have a general accounting between the parties. The trial court determined the equities in favor of the defendants, and dismissed the petition of plaintiff in relation to the cancellation of the mortgage, adjudged that the contract for purchase had been forfeited, and that the defendants have and recover judgment against the plaintiff in the sum of $7,748.13, with interest, as the balance due on the accounting.  Plaintiff appeals.—*Affirmed.*

*Johnston & Shinn* and *Charles Hutchinson,* for appellant.

*Johnson & Teter,* for appellees.

DE GRAFF, J.—This appeal is an echo of a certain transaction which had its origin in 1919, at the beginning of the frenzied period of land speculation in this state.  The issues in this cause may be understood by a statement of the pleaded and the evidential facts.  The defendant J. B. Elliott was the owner of a 428-acre improved farm in Marion County, Iowa, and had listed said farm for sale at a price of $310 per acre. Certain land agents found a purchaser in one E. L. Seibel, who entered into a contract of purchase with Elliott, and at the time of sale gave his check for $1,000, and pledged a note as collateral for the initial payment, which was to be made March 1, 1920.  Elliott agreed to pay the real estate agent a 2 per cent commission on the sale, or the sum of $2,653.60.

It appears that, prior to this time, the plaintiff had various conversations with Elliott concerning the purchase of the farm at a price of $300 per acre. Nothing resulted from these talks, but, after plaintiff learned of the sale to Seibel, he indicated to Elliott that he was willing to purchase the land. Thereupon Elliott negotiated with Seibel, and advised the latter that he had a purchaser who would take the land, and shortly thereafter, Seibel gave to Elliott an exclusive right to sell the farm at $315 per acre. He further agreed that, if the land was sold at that price, Seibel would accept $1,000 as his profit on the deal, and the $1,140 balance should be accepted by Elliott as his commission. It was further understood that Elliott should deal directly with plaintiff, and that the contract of purchase executed by Seibel should be surrendered. This resulted in a contract of sale of the farm between Elliott and plaintiff on July 23, 1919, at which time plaintiff executed his promissory notes for $3,140, which represented two items: (1) $1,000 as part payment on the purchase price, and (2) $2,140 as the profit to Seibel.

In closing the Seibel transaction, Elliott retained the notes of plaintiff, and gave to Seibel his personal check for $1,000, and returned to Seibel his check for $1,000. This was done as a matter of convenience in bookkeeping.

It is contended by plaintiff that the sale by Elliott to Seibel was mere sham and a fraud to induce plaintiff to pay $315 per acre, but a careful reading of the record discloses the *bona fides* of the transaction.

It may be said further that, although the plaintiff Converse had many dealings with Elliott, as his banker, there is nothing to establish confidential relations between the parties. The trial court recognized that the failure on the part of Elliott to disclose to the plaintiff Converse his entire transaction with Seibel was a sufficient warrant to credit the plaintiff on the accounting with the commission, but that it did not constitute misrepresentation or fraud. With this view we concur.

We now pass to the subsequent events. The plaintiff took possession of the farm on March 1, 1920, and at that time purchased at public sale from the defendant personal property amounting to $2,679.87, for which plaintiff gave his promissory

notes.  Other moneys were advanced to the plaintiff and evidenced in like manner.

On the date of taking possession, plaintiff was not able to pay the stipulated amount in the contract, to wit, $10,000 on the first day of March, 1920, nor was he able to pay any of the notes representing money that had been advanced by Elliott. This led to further negotiations, and it was proposed by the plaintiff that he should execute a second mortgage on plaintiff's farm located in Indiana Township in said county.  This was satisfactory to Elliott, provided that plaintiff executed three notes for $5,000 each, two of which were to cover the deferred payment on the purchase price of the farm, and the third to cover the money heretofore advanced by Elliott to plaintiff. This was agreed, and three notes of $5,000 each, secured by the mortgage, were executed.

Plaintiff alleges in his petition that the third note was procured by fraud, and should not have been included in the mortgage, claiming that it was his understanding and belief that there were but two notes to be executed.  Converse labored under a mistaken notion of the agreement.  He first testified that he had executed but two notes, but finally admitted that his signature was also attached to the third.  He also claimed that his wife did not sign the notes; but the wife testified that the signatures looked like hers, and the defendant testified that she signed all three notes.  She admits the signature on the mortgage, and there can be no question but that the notes and mortgage were signed by the alleged makers.  The contention of plaintiff in this particular is without merit.

The contract of purchase further provided that the plaintiff Converse was to make payment of $2,000 on the first day of February, 1921, plus the interest then due on deferred payments.  He failed to make this payment.  It is a well known fact that, at and prior to this particular time, a very marked deflation of values of both land and the products of land had taken place.  Plaintiff was an extensive stock feeder, and the breeder of pure-bred live stock.  He was caught in the maelstrom, and this is a sufficient explanation of his inability to meet his outstanding obligations.

The defendant Elliott was apprised of the financial situa-

tion of the plaintiff, and fully realized that it would be impossible for plaintiff to face the situation successfully.

A notice of forfeiture had been prepared by Elliott to serve on Converse, and, in fact, it was presented to him for acceptance of service. Thereupon, a plea for further time was made by plaintiff, who was actuated with a sincere hope and belief that conditions would improve during the ensuing year, and that, by February 1, 1922, he would be in a position to meet his matured obligations and to pay the further sum of $2,000, as per contract stipulation. This resulted in a written contract between plaintiff and defendant, wherein it is provided that:

"The contract entered into between said parties for the sale of said real estate shall be canceled, set aside and held for naught, and all rights created thereby are hereby canceled and determined. That the said Converse shall be permitted to hold the possession of said real estate during the season of 1921, and agrees to farm said premises in a good and workmanlike manner * * *. In the event of failure of the second party [Converse] to properly attend to the cultivating and harvesting of crops in their proper season, the party of the first part shall have the right to take charge of the men on said farm, and to hire such additional men as may be necessary to attend to the cultivation and harvesting of the crops. It is further agreed that all crops of every kind and character grown upon said premises during the season of 1921 shall be the property of the party of the first part [Elliott], and shall not be fed to any stock without the consent of the first party. * * * It is further agreed that the party of the second part shall have the right and option at any time prior to the first day of February, 1922, to renew the contract for the purchase of said premises, made on the 23d day of July, 1919, by paying the amount due under said contract on the first day of February, 1921, together with interest thereon from the first day of February, 1921, and by paying the amount due by the terms of said contract on the first day of February, 1922, and in the event that such payments are made prior to the first day of February, 1922, then said contract shall be reinstated and be in full force between the parties hereto."

These are the material provisions necessary to be considered in determining the vital question on this appeal.

By way of further statement of fact it may be said that the plaintiff continued in possession of the farm until September, 1921, when he removed therefrom and abandoned it. No demand was made at that time by Converse for repayment of the money on the purchase price, nor for the cancellation of the mortgage, and not until shortly before the commencement of this action, on September 22, 1923.

In answer to the petition filed, defendant also prayed that a general accounting be had between the parties on all of the business transactions between them. The trial court carefully inquired into the matter, studied the bookkeeping in relation thereto, and prepared a balance sheet, which disclosed that the plaintiff was indebted to the defendant in the sum of $7,748.13. No purpose will be served in reviewing the items shown on the balance sheet, as but one question demands further consideration.

It is but natural that, in a case of this proportion, some conflict in the testimony will be found; but we do not deem it of such a serious character as to merit further review. Sufficient to state, there is not sufficient evidence to predicate a finding of fraud in any of the transactions involved.

There is but one ultimate question. What is the legal effect of the contract entered into between the plaintiff and the defendant in February, 1921? Was it intended by said contract to provide for a forfeiture of all the plaintiff's rights under said contract and the forfeiture of all the amounts which he had paid under said contract, and simply give to the plaintiff an option to reinstate the original contract of purchase at any time prior to February 1, 1922, by meeting the conditions recited in said contract?

In this connection it may be observed that the defendant, in answer, prayed:

"That, in the event the court should find that said contract fails to carry out the intention of the parties, the same should be reformed so as to express their true intention, and to provide for a forfeiture of all the rights of the plaintiff under said

contract, and a forfeiture of all the amounts that he had paid or secured to be paid on said contract."

This court has frequently said that the law does not favor forfeitures, and will not by implication or construction create them. Furthermore, when a contract for the purchase of real estate is mutually abandoned or rescinded, even though one of the parties is in default, and there is no understanding as to the return or forfeiture of the purchase money paid, the purchaser is entitled to have returned to him all that he had paid on the purchase price, either in money or property, and to be put *in statu quo,* less the reasonable value of the use of the property during the time he occupied it.

The later contract is not as specific as it might be in the use of the term "forfeiture." However, there is no magic in the mere word. Under the facts and circumstances, we have no hesitation in holding that it was the true intention to declare a forfeiture of this contract and to give Converse an option to reinstate the same on or before a certain date, by meeting certain specified conditions.

The plaintiff knew that his contract was about to be forfeited. He was acquainted with the fact that notice of forfeiture had been prepared, and had been presented to him for acceptance. He was asking for more time; and, instead of receiving thirty days' grace, he desired a year, and attempted to devise a way by which he could effectuate the payment of his obligations. The second contract clearly recognized the inability of plaintiff to comply with the terms of the first contract, and it specifically cancels, sets aside, and terminates all rights created thereunder. It did give the plaintiff the right to retain possession for the year 1921, but it also gave the right to the defendant to take possession in the event of the failure on the part of plaintiff to operate the farm properly, and to sell the crops and credit the proceeds upon the advances made by defendant in operating the farm. Plaintiff made no effort to reinstate the original contract, but in fact abandoned the farm.

The contract was dealing with the rights of the plaintiff, and it was by reason of his defaults that the second contract was called into being. The entire absence of any reference in the contract to placing the plaintiff *in statu quo* has much sig-

nificance. The record makes it apparent to this court, as it did to the trial court, that a forfeiture was what the parties had in mind, and not a rescission.

It is pointed out by the trial court that, while Converse has been a loser by the transaction, Elliott has not gained any large amount, and that the down payment of $10,000, represented by the two notes given by plaintiff, does not greatly exceed the rental value of the land for 1920 and 1921, during which time Converse had the use of the farm.

The decree entered by the trial court is—*Affirmed.*

FAVILLE, C. J., and STEVENS and VERMILION, JJ., concur.